## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM G. LONG, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1358-MN |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Plaintiff William G. Long, Jr. ("Mr. Long") filed this action pursuant to 42 U.S.C. §

405(g) on October 7, 2020 against the defendant Kilolo Kijakazi, the Acting Commissioner of

the Social Security Administration (the "Commissioner").  (D.I. 1)  Mr. Long seeks judicial

review of the Commissioner's February 4, 2020 final decision, denying Mr. Long's claim for

disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42

U.S.C. §§ 401–434.  Currently before the court are cross-motions for summary judgment filed

by Mr. Long and the Commissioner.[2]  (D.I. 16; D.I. 18)  Mr. Long asks the court to reverse the

Commissioner's decision and remand for either payment of benefits or further administrative

proceedings.  (D.I. 17 at 20)  The Commissioner requests that the court affirm the ALJ's

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.
Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi is
substituted as Defendant in place of Andrew Saul.

[2] The briefing for the present motions is as follows: Mr. Long's opening brief (D.I. 17), the
Commissioner's combined opening brief in support of the motion for summary judgment and
answering brief in opposition to Mr. Long's motion (D.I. 19), and Mr. Long's answering brief in
opposition to the Commissioner's motion and reply brief (D.I. 20).

decision.  (D.I. 19 at 20)  For the reasons set forth below, I recommend that the court DENY

Mr. Long's motion for summary judgment (D.I. 16), and GRANT the Commissioner's cross-

motion for summary judgment (D.I. 18).

## II.      BACKGROUND

### A. Procedural History

Mr. Long filed a DIB application on October 24, 2017, alleging a disability onset date of

October 24, 2017 due to multiple conditions including a back injury, arthritis, diabetes, heart

disease, and human immunodeficiency virus ("HIV").  (D.I. 10 at 201-02, 247)  Mr. Long's

claims were initially denied on July 11, 2018, and they were denied again on reconsideration on

December 14, 2018.  (*Id.* at 121-25, 132-34)

At Mr. Long's request, an administrative law judge ("ALJ") held a hearing on January

15, 2020.  (*Id.* at 33-72)  The ALJ issued an unfavorable decision on February 4, 2020, finding

that Mr. Long was not disabled under the Act because he could perform a reduced range of light

work.  (*Id.* at 24-32)  The Appeals Council subsequently denied Mr. Long's request for review of

the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at

10-12)

Mr. Long brought this civil action challenging the ALJ's decision on October 7, 2020.

(D.I. 1)  Mr. Long filed a motion for summary judgment on May 10, 2021 (D.I. 16), and the

Commissioner cross-moved for summary judgment on May 19, 2021 (D.I. 18).  Briefing is now

complete on the pending motions.

## B. Medical History

### 1. Medical evidence

Mr. Long was 56 years old on October 24, 2017, his alleged disability onset date.  (D.I. 10 at 24)  Mr. Long has a high school degree and two years of college, and he has past relevant work as an accounting controller and a casino dealer.  (*Id.* at 248, 308-10)  The ALJ found that Mr. Long had the following severe impairments: degenerative disc disease and coronary artery disease status post stent placement.  (*Id.* at 26)  The focus of Mr. Long's motion for summary judgment is on the adequacy of the ALJ's assessment of limitations stemming from Mr. Long's degenerative disc disease and mental conditions.  (D.I. 17)  Because Mr. Long does not challenge the ALJ's decision regarding his HIV condition and heart condition, the court does not address those conditions here.

### (a) Degenerative disc disease of the lumbar spine

Mr. Long has a history of lower back and leg pain.  His primary care physician, Dr. Adam Rudnick, ordered an MRI of his lumbar spine in September 2017 after Mr. Long underwent three to four weeks of physical therapy without improvement in his legs.  (D.I. 11 at 195-97, 206)  The results of the MRI showed congenital spinal stenosis and nerve root compression.  (*Id.* at 198-99)

On November 3, 2017, Mr. Long underwent a neurosurgical consultation with Dr. Bikash Bose, M.D.  (*Id.* at 204)  Dr. Bose reviewed the September 2017 MRI of Mr. Long's lumbar spine and performed a physical examination, which revealed mild tenderness on palpitation over the lower lumbosacral spine and sciatic notches, with full motor strength in the upper extremities, negative straight leg raising test negative to 70 degrees bilaterally, and intact pinprick sensation.  (*Id.*)  Dr. Bose found that Mr. Long had slightly reduced motor strength in

3

several lower extremity motor groups and bilateral atrophy of his dorsal foot muscles.  (*Id.*)  Dr. Bose recommended that Mr. Long either receive spinal injections or undergo a lumbar discectomy and fusion surgery.  (*Id.*)

Mr. Long also began receiving pain management treatment from Selina Xing, M.D. in November 2017.  ( D.I. 12 at 243)  Dr. Xing prescribed Tylenol with codeine and Lyrica to treat Mr. Long's pain.  (*Id.* at 245)  The following month, Mr. Long reported that he had a bad reaction to Lyrica and the Tylenol did not help mitigate his pain.  (*Id.* at 239)  Dr. Xing then prescribed Percocet to manage Mr. Long's pain.  (*Id.* at 241)  Dr. Xing's physical examinations from November 2017 through September 2019 consistently found that Mr. Long's gait and balance were normal, he did not use an assistive device for ambulation, he had 5/5 strength in his bilateral lower extremities, slightly reduced bilateral hip abduction and adduction, negative straight leg raising tests, reduced bilateral reflexes, and slightly reduced lumbar extension.  (D.I. 12 at 227, 231, 234, 237, 243, 388, 392, 396, 400, 404; D.I. 13 at 98, 101, 105, 109, 113, 117, 120, 123, 127, 131)

Mr. Long received bilateral selective nerve root block injections in August 2018 and March 2019.  (D.I. 12 at 407; D.I. 13 at 95)  After each injection, Mr. Long reported temporary improvement in his pain levels and his physical exam results remained unchanged.  (D.I. 12 at 391-92; D.I. 13 at 117)  Mr. Long continued to manage his pain with Percocet following the procedure, and a physical examination on September 12, 2019 did not indicate any change from his previous condition.  (D.I. 13 at 97, 98)

### (b) Mental conditions

Mr. Long began treatment with therapist Lawrence S. Yurow in January 2015, after he was fired from the job he had held for more than twenty years.  (D.I. 13 at 187)  Mr. Long

presented with sadness, crying spells, loss of interest in activities, psychomotor retardation, sleeplessness, lack of energy, social withdrawal, hopelessness, and recurrent thoughts of death. (*Id.*) Mr. Yurow diagnosed Mr. Long with depressive disorder and made no changes to his prescriptions for Xanax and Ambien. (*Id.* at 187-88) Mr. Long's depressive disorder remained unchanged at subsequent appointments in July and September 2015. (*Id.* at 189, 192)

At follow up appointments in April and December 2016, Mr. Yurow indicated that Mr. Long's depression was in partial remission. (*Id.* at 193, 197) Mr. Long reported that he was not experiencing any of his previous symptoms except for occasional sadness and loss of meaning and purpose for life. (*Id.*) During the December 2016 visit, Mr. Yurow also indicated Mr. Long experienced a compulsion to perform repetitive actions and thoughts that harm will befall his family. (*Id.* at 197)

Mr. Long sought treatment at Harmonious Mind, LLC on August 31, 2017, where Fawzia Hasan, M.D. diagnosed him as having major depressive disorder, generalized anxiety disorder, and provisional insomnia disorder. (D.I. 11 at 226) Mr. Long's Mental Status Exam ("MSE") at this time was normal in all areas, with the exception of his anxious and depressed mood. (*Id.*) Dr. Hasan continued Mr. Long's prescription for Xanax, but on a smaller dosage with the intent to taper off use. (*Id.* at 288) Dr. Hasan also prescribed Remeron for insomnia, but discontinued the prescription in March 2018 after Mr. Long reported having nightmares. (D.I. 11 at 288; D.I. 12 at 264)

Mr. Long had fifteen subsequent meetings with Dr. Hasan between August 31, 2017 and October 10, 2019. (D.I. 12 at 260-65, 276-78; D.I. 13 at 148, 151, 154, 156, 158, 160, 162, 164, 166) The MSEs from each of these meetings consistently reported the same diagnoses and findings: normal results in each category with the exception of Mr. Long's anxious and

depressed mood. (*Id.*) Dr. Hasan continued Mr. Long's prescription for Xanax and added a prescription for Cymbalta in June 2019. (D.I. 13 at 160, 164, 166) In March 2019, Dr. Hasan identified a mild cannabis use disorder. (*Id.* at 156, 158, 160, 162, 164, 166)

On two occasions in October 2019, Mr. Long returned to Mr. Yurow with complaints of anger, irritability, sadness, and occasional crying spells, as well as general social alienation and isolation. (*Id.* at 199, 203) Mr. Yurow observed that Mr. Long appeared anxious and agitated with rapid speech, consistent with his diagnosis of generalized anxiety disorder. (*Id.* at 199-200, 203) Mr. Yurow indicated that Mr. Long's anxiety was mostly episodic. (*Id.* at 204) Mr. Long continued to complain of significant anxiety symptoms in December 2019, but he also described his efforts to improve his interpersonal communications and family relationships. (*Id.* at 207)

### 2. Medical opinions

On July 8, 2018, Mr. Long's record was reviewed by state agency physician Christopher King, Psy.D., who concluded that Mr. Long did not have a severe mental impairment and was capable of maintaining appropriate social behavior based on the stability of his condition throughout his progress notes. (D.I. 10 at 92) A second review of Mr. Long's psychiatric record was conducted by state agency physician Thomas Fink, Ph.D., on November 27, 2018. (*Id.* at 112) Mr. Fink concurred with Dr. King's findings and opined that Mr. Long's mental impairments appeared non-severe. (*Id.*)

In August 2019, Mr. Long's physical therapist, Carina Rodriguez, performed a Residual Functional Capacity ("RFC") assessment and concluded that Mr. Long could work at a sedentary to light level for two to four hours with changes in position to manage his pain. (D.I. 13 at 90, 92) Ms. Rodriguez also opined that Mr. Long could tolerate standing, sitting, and walking occasionally, and that he could safely lift up to 25 pounds occasionally. (*Id.*) Dr. Xing

concurred with Ms. Rodriguez's opinion on August 21, 2019.  (*Id.* at 93)

On December 20, 2019, Mr. Yurow conducted a Psychological Functional Capacity evaluation of Mr. Long and concluded that his generalized anxiety disorder and strong features of depressive personality would prevent him from performing simple, repetitive work 40 hours a week without missing more than two days of work per month due to deficits in his attention, concentration, and memory. (D.I. 13 at 211)  Mr. Yurow indicated that Mr. Long had moderately severe impairments in his ability to sustain work performance and attendance and cope with the pressures of ordinary work; moderate impairments in his ability to relate to others, maintain personal habits, and perform repetitive tasks under ordinary supervision; and mild impairments in his ability to perform activities of daily living and understand and carry out simple instructions under ordinary supervision.  (*Id.* at 212-13)

### C. Hearing Before the ALJ

#### 1. Mr. Long's Testimony

At the administrative hearing on January 15, 2020, Mr. Long testified that he previously worked as an accounting controller and currently works as a part-time casino dealer.  (D.I. 10 at 45-52)  Mr. Long's position as an accounting controller required him to be on his feet 30% of the time and infrequently lift objects weighing up to 50 pounds.  (*Id.* at 48-49)  Mr. Long's position as a part-time casino dealer is mostly sedentary and requires lifting no more than 10 pounds.  (*Id.* at 46)  After briefly working as a full-time casino dealer in 2017, Mr. Long took a leave of absence and was subsequently terminated because his leg and lumbar pain made it difficult for him to physically sustain full-time employment.  (*Id.*)  Mr. Long's positions as an accounting controller and as a casino dealer required a high level of social interaction and some mathematical proficiency.  (*Id.* at 47-52)

7

Mr. Long testified that he lives in a house with his daughter and two grandchildren. (*Id.* at 53) He described how his pain limited his ability to drive for extended periods of time, and he felt frustrated that the pain left him unable to play or interact with his grandchildren. (*Id.* at 54) As a result of his pain, Mr. Long explained that he spends most of his time at home on the couch with his legs elevated. (*Id.* at 60)

Mr. Long testified that he takes Percocet, which generally reduces his pain levels from an "eight" to a "four or five," although its effectiveness has diminished over time. (*Id.* at 61-62) He also testified that his lumbar injections relieved his pain for only a few days after each procedure. (*Id.*) Due to his heart condition and the potential risks, Mr. Long declined to pursue surgery. (*Id.*) Mr. Long reported that he used marijuana infrequently to help manage his pain and mental anguish. (*Id.* at 70)

Mr. Long also testified that he sought treatment for depression in 2014 to address his extreme weight loss, feelings of helplessness, lack of motivation, social irritability, and exhaustion. (*Id.* at 62-64) Mr. Long stated that his treating therapist, Mr. Yurow, encouraged him to undergo further neuropsychological testing after he began having memory issues that impacted his ability to perform his job as a casino dealer. (*Id.* at 65) Mr. Yurow also recommended a procedure to help stabilize Mr. Long's emotional outbursts and hysterical crying fits. (*Id.* at 67)

### 2. Vocational Expert Testimony Before the ALJ

At the administrative hearing in January 2020, the ALJ posed the following hypothetical to vocational expert Adina Leviton ("the VE"):

> [P]lease assume an individual of the Claimant's age, education and experience.
> Such an individual is able to perform sedentary work; occasionally climbs ramps
> and stairs; and never climb ladders, ropes, or scaffolds; occasionally balance,
> stoop, kneel, crouch, crawl; tolerate occasional exposure to extreme heat, extreme

cold, humidity, wetness, vibrations, fumes, odors, dust, gases, poor ventilation, vibrations, and hazards such as moving machinery or unprotected heights.

(D.I. 10 at 72-73)  In response to the ALJ's hypothetical, the VE testified that such a hypothetical individual could perform the controller job per DOT, but not as actually performed, nor could the individual perform the casino dealer job.  (*Id.* at 73)  The ALJ then adjusted the hypothetical and asked whether such an individual could perform the casino dealer job according to the conditions described by Mr. Long.  (*Id.* at 73-74)  The VE testified that such an individual could perform the job according to Mr. Long's description of his part-time position because it was a sedentary position and did not require lifting more than 10 pounds.  (*Id.*)  However, the VE testified that such an individual would not be able to perform the tasks required of a full-time casino dealer because it required standing for one hour per shift and lifting up to 25 pounds.  (*Id.* at 74)  If the hypothetical were adjusted to require the individual to move between seated and standing positions for five minutes every hour, the VE opined that the individual could perform the job, so long as the individual's changes in position could be done at the work station.  (*Id.* at 74-75)

Mr. Long's counsel then asked the VE to consider whether any of the past work would be available if the hypothetical individual were limited to working less than forty hours a week.  (*Id.*)  The VE responded that Mr. Long's past work would not be available to the hypothetical individual on a full-time basis.  (*Id.*)  The VE also confirmed that Mr. Long's past work would not be available if the hypothetical individual were limited to simple, routine, or unskilled work.  (*Id.*)  The VE explained that there would no longer be work if the hypothetical individual had a loss of productivity greater than 15 to 20% and consistent absences one or more days per month.  (*Id.* at 76)

### D. The ALJ's Findings

Based on the factual evidence in the record and the testimony by Mr. Long and the VE,

the ALJ determined that Mr. Long was not disabled under the Act for the relevant time period

beginning on October 24, 2017. (D.I. 10 at 26-32)  The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act
through March 31, 2023.

2. The claimant has not engaged in substantial gainful activity since October 24,
2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease;
and coronary artery disease, status-post stent placement (20 CFR
404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that
meets or medically equals the severity of one of the listed impairments in 20
CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and
404.1526).

5. After careful consideration of the entire record, the undersigned finds that the
claimant has the residual functional capacity to perform light work as defined
in 20 CFR 404.1567(b) except occasionally climb ramps, stairs; never climb
ladders, ropes, scaffolds; occasionally balance, stoop, kneel, crouch, crawl;
tolerate occasional exposure to extreme cold, extreme heat, humidity,
vibrations, fumes, odors, dust, gases, poor ventilation, hazards.

6. The claimant is capable of performing past relevant work as an accounting
controller and casino dealer. This work does not require the performance of
work-related activities precluded by the claimant's residual functional
capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security
Act, from October 24, 2017, through the date of this decision (20 CFR
404.1520(f)).

(D.I. 10 at 26-32)

## III.    STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial

evidence supports the decision.[3]  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139

---

[3] In this case, Mr. Long also argues that the ALJ made a series of legal errors in the decision.
(*See, e.g.*, D.I. 17 at 3 n.1)  The Third Circuit has recognized that the court may assess whether

S. Ct. 1148, 1154 (2019). "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 687 (3d Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "more than a mere scintilla" of evidence. *Id.*

## IV.   DISCUSSION

### A. Disability Determination Process

Title II of the Act affords insurance benefits to people who contributed to the program and who have a disability. *See Pearson*, 839 F. App'x at 687 (citing 42 U.S.C. § 423(a)(1)). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if the impairments are so severe that they preclude a return to previous work or engagement in any other kind of substantial gainful work existing in the national economy. *Id.* at § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). To qualify for disability insurance benefits, a claimant must establish disability prior to

---

the Commissioner applied the correct legal standards. *See Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983). Courts exercise plenary review of legal issues and review the ALJ's findings of fact to determine whether they are supported by substantial evidence. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999) (internal citations omitted).

the date last insured.  20 C.F.R. § 404.131 (2016); *Zirnsak v. Colvin*, 777 F.3d 607, 611-12 (3d

Cir. 2014).

The Commissioner must perform a five-step analysis to determine whether a person is

disabled.  *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).  If

the Commissioner makes a finding of disability or non-disability at any point in the sequential

process, the Commissioner will not review the claim further.  20 C.F.R. § 404.1520(a)(4).  At

step one, the Commissioner determines whether the claimant is engaged in any substantial

gainful activity.  *See id.* at § 404.1520(a)(4)(i).  If the claimant is not engaged in substantial

gainful activity, step two requires the Commissioner to determine whether the claimant is

suffering from a severe impairment or a severe combination of impairments.  *See id.* at §

404.1520(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the

claimant's impairments to a list of impairments that are presumed severe enough to preclude any

gainful work.  *See id.* at § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428.  When a claimant's

impairment or its equivalent matches a listed impairment, the claimant is presumed disabled.  *See*

20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment, either singly or in combination, fails

to meet or medically equal any listing, the analysis continues to steps four and five.  *See id.* at §

404.1520(e).

At step four, the ALJ considers whether the claimant retains the residual functional

capacity ("RFC") to perform past relevant work.  *See id.* at § 404.1520(a)(4)(iv); *Plummer*, 186

F.3d at 428.  A claimant's RFC "measures the most she can do despite her limitations." *Zirnsak*

*v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal

quotations and alterations omitted).  The claimant bears the burden of demonstrating the inability

to return to past relevant work.  *See Plummer*, 186 F.3d at 428.

      If the claimant is unable to return to past relevant work, at step five, the Commissioner

must demonstrate that the claimant's impairments do not preclude an adjustment to any other

available work.  *See* 20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 428.  In other words, the

Commissioner must prove that "there are other jobs existing in significant numbers in the

national economy which the claimant can perform, consistent with her medical impairments, age,

education, past work experience, and [RFC]."  *Plummer*, 186 F.3d at 428.  The ALJ must

analyze the cumulative effect of all the claimant's impairments in determining whether he or she

is capable of performing work and is not disabled.  *See id.*  The ALJ often seeks the VE's

assistance in making this finding.  *See id.*

### B.  Whether the ALJ's Decision is Supported by Substantial Evidence

      Mr. Long's motion for summary judgment focuses on three overarching issues: (1)

whether the ALJ failed to incorporate Mr. Long's credible mild mental limitations in the RFC

finding and the hypothetical question; (2) whether the ALJ properly applied the *de minimis*

severity standard to Mr. Long's mental impairments; and (3) whether the ALJ erred in her

evaluation of Mr. Long's lumbar impairment.

### 1.  Consideration of Mr. Long's credible mental limitations

      Mr. Long argues that the ALJ erred by failing to adopt mild mental limitations she found

credible at step two in her RFC finding or her hypothetical question.  (D.I. 17 at 2-8)  According

to Mr. Long, the ALJ's error is not harmless because Mr. Long's past relevant work was skilled,

and the omission of a mild mental functional limitation is legal error when the issue involves

performing skilled work or work that requires a high reasoning level.  (*Id.* at 5-6)

In response, the Commissioner asserts that the ALJ was not required to account for Mr. Long's mild mental limitations in her RFC assessment because the record did not support any work restrictions stemming from the mild mental limitations. (D.I. 19 at 11)  The Commissioner further alleges that any error in the ALJ's analysis of Mr. Long's mental limitations at step four was harmless, noting that Mr. Long did not identify any additional mental limitations that are warranted by the record evidence. (*Id.* at 13-14)

The ALJ did not err in failing to incorporate limitations associated with Mr. Long's mental impairments in the RFC assessment and hypothetical question posed to the VE. Although an ALJ must consider limitations imposed by all of an individual's impairments, both severe and non-severe, when making their RFC assessment, there is no requirement that an ALJ must find or include limitations associated with mild impairments. *See Smith v. Comm'r of Soc. Sec.*, 2016 WL 3912850, at *9 (D.N.J. July 19, 2016) (concluding that the ALJ did not err in declining to include mental limitations in the RFC because he clearly considered the plaintiff's depression and concluded that the symptoms did not significantly limit her basic work activities). Indeed, the Third Circuit has explained that broad findings of limitations at step two of the sequential evaluation should not cloud the substance of the ALJ's overall review, including how well the ALJ understood the record and the claimant's specific impairments before making an RFC determination. *See Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167, 168 (3d Cir. 2014) (rejecting the claimant's argument that the ALJ erred by failing to tell the VE she had moderate difficulties in concentration, persistence, and pace).

At step two of the sequential analysis, the ALJ considered Mr. Long's mental impairments and found that Mr. Long did not have more than mild, non-severe, limitations in four areas of the "paragraph B" mental functional analysis codified at 20 C.F.R. §

404.1520a(c)(3): (1) understanding, remembering, and applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. (D.I. 10 at 28)  The ALJ's conclusion was based on her consideration of the record, which indicated that Mr. Long's mental conditions were managed with medication, his mental status exams consistently revealed normal findings, and he was able to live with his daughter and maintain part-time employment at a casino.  (*Id.* at 27)  The ALJ was persuaded by the State agency psychological consultants, who concluded that Mr. Long had only non-severe mental impairments with no mental limitations based on the medical evidence of record showing normal mental status exam findings.  (*Id.*)  Evidentiary support for Mr. Long's mild mental limitations was limited to the ALJ's decision to credit Mr. Long's testimony and subjective reports.  (*Id.* at 28)  These considerations confirm that the ALJ had sound knowledge of the entire record and understood the impact of Mr. Long's mental impairments before determining Mr. Long's RFC. *See Shaffer v. Colvin*, 2014 WL 4925067, at *5 (W.D. Pa. Sept. 30, 2014) ("It is clear from the record that the ALJ adequately considered all of the relevant medical evidence, as well as plaintiff's reported activities, in assessing plaintiff's residual functional capacity, and that he incorporated into his finding all of the limitations that reasonably could be supported by the medical and other relevant evidence."); *McCafferty v. Astrue*, 2008 WL 1869282, at *4 (E.D. Pa. Apr. 25, 2008) (finding that the requirements of SSR 96-8p were satisfied by ALJ's narrative discussion of the claimant's functional limitations in the context of the objective medical evidence, doctors' notes and opinions, the claimant's activities of daily living, and the claimant's subjective complaints).

Mr. Long objects to the ALJ's recitation of boilerplate language to explain how she factored Mr. Long's mental impairments into the RFC at step four of the sequential analysis:

15

> The limitations identified in the "paragraph B" criteria are not a residual
> functional capacity assessment but are used to rate the severity of mental
> impairments at steps 2 and 3 of the sequential evaluation process. The mental
> residual functional capacity assessment used at steps 4 and 5 of the sequential
> evaluation process requires a more detailed assessment. The following residual
> functional capacity assessment reflects the degree of limitation the undersigned
> has found in the "paragraph B" mental function analysis.

(D.I. 10 at 28)  But recent case law addressing nearly identical language supports the

Commissioner's position that the step four RFC analysis adequately reflected the ALJ's thorough

analysis of the mental limitations at step two. *See Brumfield v. Saul*, 2020 WL 4934315, at \*5-6

(E.D. Pa. Aug. 21, 2020).  As in *Brumfield*, it was reasonable for the ALJ in this case not to

include work-related limitations in the RFC based on Mr. Long's mild mental impairments

because "[s]uch a finding is consistent with the substance of the analysis done at step two." *Id.*

at \*6; *see Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) ("[N]o incantations are

required at steps four and five simply because a particular finding has been made at steps two

and three.").  Because Mr. Long's mild mental impairments did not translate into work-related

limitations, the ALJ's failure to explicitly discuss those impairments in the RFC analysis does

not amount to an error. *See Wardell v. Berryhill*, C.A. No. 18-918-RGA, 2019 WL 1579501, at

\*6-7 (D. Del. Apr. 12, 2019) (upholding the ALJ's determination that mild mental limitations not

impacting the claimant's ability to function need not be included in the hypothetical posed to the

VE or the RFC assessment).

Mr. Long relies on the Middle District of Pennsylvania's decision in *Kich v. Colvin*, 218

F. Supp. 3d 342 (M.D. Pa. 2016), in support of his position that the ALJ erred by omitting mild

functional limitations based on the paragraph B criteria from the RFC finding where, as here, Mr.

Long's past relevant work was skilled in nature.  (D.I. 17 at 5)  But the decision in *Kich* noted

that the ALJ mischaracterized the evidence of record in some respects by suggesting there was

no evidence of in-office panic attacks, when in fact, the claimant's provider had completed a questionnaire confirming the claimant's in-office panic attacks.  *Kich*, 218 F. Supp. 3d at 359. Here, in contrast, there is no suggestion that the ALJ's discussion of the evidence on this issue was not supported by substantial evidence.  Moreover, the court's focus in *Kich* was on the proper procedure to evaluate a substance abuse disorder, and there is no indication that an RFC of skilled versus unskilled work was determinative.  *See Valdez v. Berryhill*, 2017 WL 5988652, at *3 (D. Colo. Dec. 4, 2017) (discussing *Kich*, 218 F. Supp. 3d 342).  An ALJ is "not required to incorporate any particular functional limitation in the RFC based on [the] Step Two findings of mild limitations in social functioning and concentration, persistence, and pace," so long as the record shows the ALJ considered the mental limitations.  *See Taylor v. Berryhill*, 2018 WL 3887521, at *6 (E.D. Mich. July 5, 2018) (rejecting the holding in *Kich*).  For these reasons, Mr. Long's reliance on *Kich* is not persuasive.

Even if the ALJ's step four analysis was incomplete, any error was harmless.  Mr. Long disagrees with the ALJ's omission of the mild mental impairments from the RFC and hypothetical question posed to the VE, yet he does not state what additional mental limitations are warranted by the evidentiary record.  (D.I. 17 at 7-13)  As noted by the ALJ, Mr. Long's mental status exams were within normal limits, he was able to maintain part-time work as a card dealer in a casino, he was able to drive, he had no problem maintaining appropriate grooming habits, and he lived with his daughter and grandchildren.  (D.I. 10 at 28)  Where, as here, there is limited evidence to support work-related limitations stemming from the claimant's mental impairments, courts within this Circuit have found that any error in the ALJ's RFC assessment is harmless.  *See Brumfield*, 2020 WL 4934315, at *7-8.

17

Mr. Long contends that the ALJ's alleged error cannot be harmless because his past relevant work involved skilled positions, and even mild mental impairments would limit his ability to perform such work. (D.I. 17 at 5-6)  But courts have rejected this same argument. *See Valdez*, 2017 WL 5988652, at *3 ("The court [in *Kich*] never discussed, much less *held*, that the ALJ's finding that the claimant had an RFC for skilled work as opposed to unskilled work was determinative in its review of [the] claim.").  Moreover, the record supports a conclusion that Mr. Long could perform his past work despite his mild mental conditions.  Specifically, Mr. Long was working part-time as a casino dealer during his period of disability even though the position required a high level of functioning in the paragraph B criteria.[4]  (D.I. 10 at 27-28)  The evidence does not suggest that Mr. Long's limitations in concentration, memory, interacting with others, and managing himself had any impact on his ability to perform work as a casino dealer. (*Id.* at 28)

### 2. Application of the *de minimis* severity standard to Mr. Long's mental impairments

Mr. Long argues that the ALJ erred in her application of the *de minimis* severity standard at step two of the sequential evaluation process by: (1) mischaracterizing Mr. Long's testimony; (2) relying on outdated State agency opinions; and (3) failing to articulate meaningful reasons for rejecting Mr. Yurow's opinion. (D.I. 17 at 8)

The Commissioner maintains that substantial evidence supports the ALJ's *de minimis* finding because Mr. Long's part-time work as a casino dealer, his mental status examination

---

[4] Mr. Long subsequently argues that his part-time work as a casino dealer is not inconsistent with the impact his mental functional limitations have on his ability to work full-time. (D.I. 17 at 12) Nonetheless, the fact that any limitations in Mr. Long's concentration, memory, ability to interact with others, and ability to manage himself did not preclude him from maintaining work, part-time or otherwise, in a skilled position lends support to the ALJ's conclusion.

18

results, and his living situation confirmed his abilities under the "paragraph B" criteria. (D.I. 19 at 14-15) The Commissioner argues that the ALJ provided adequate reasons for rejecting the opinion of Mr. Yurow because it was inconsistent with Mr. Yurow's own treatment records, the results of Mr. Long's mental status examinations, and Mr. Long's continued ability to work as a part-time casino dealer. (*Id.* at 15-16)

At step two of the sequential analysis, the ALJ's evaluation of Mr. Long's mental condition was supported by substantial evidence indicating that Mr. Long's depression and anxiety were non-severe impairments. The ALJ considered Mr. Long's mental health records dating back to 2015, observing that Mr. Long's depression and anxiety were managed with medication and his mental status exam findings were consistently within normal limits in the time period between August 2017 and October 2019. (D.I. 10 at 27) The ALJ also accurately reported that more recent mental health records document significant anxiety symptoms relating to Mr. Long's relationship with his daughter, but by Mr. Long's own account, his depression improved after he returned to work. (*Id.*) The ALJ's decision is consistent with Mr. Long's testimony about his return to work: "[O]nce I was able to start working again, that gave me – that with the therapy helped me out of a situation that I felt like I was in a big, black hole, that I wasn't going to get out of." (*Id.* at 63) Accordingly, the administrative record contains sufficient evidence to support the ALJ's factual determination regarding the severity of Mr. Long's mental impairments. *Biestek*, 139 S. Ct. at 1154.

Mr. Long argues that the ALJ mischaracterized his testimony about his interpersonal conflict with his daughter, suggesting that the ALJ incorrectly presumed that their cohabitation indicated they were not in conflict. (D.I. 17 at 9-10) But Mr. Long ignores critical aspects of the ALJ's reasoning on this point. The ALJ acknowledged that "[r]ecent mental health records note

19

Case 1:20-cv-01358-MN   Document 22   Filed 01/31/22   Page 20 of 27 PageID #: 1531

significant anxiety symptoms relating to interpersonal conflict the claimant is having with his daughter," but she concluded that "this is inconsistent with the claimant's testimony that he is moving in with his daughter and he continues to work part-time at a casino. The claimant also testified that his depression improved after he was able to start working again." (D.I. 10 at 27) The ALJ's decision focused not only on Mr. Long's living situation, but also on Mr. Long's successful transition to part-time work as a casino dealer, a job that requires extensive social interaction, and the improvements in his mental condition resulting from his return to work. The ALJ's analysis is supported by the record, which includes testimony from Mr. Long that it is important for his mental health to do something productive, and his difficulties with social interaction stem in part from his frustration with being dependent and unable to work. (D.I. 10 at 64-65) Mr. Yurow's treatment notes further indicate that the timing of Mr. Long's remission and improved functioning coincided with his part-time employment as a casino dealer, and his depression and anxiety were "not interfering with his ability to function." (D.I. 13 at 195, 197)

Mr. Long incorrectly accuses the ALJ of assuming that removal of a single stressor would "completely eradicate" Mr. Long's mental impairments. (D.I. 17 at 10) The ALJ's decision states that Mr. Long's recent treatment with Mr. Yurow "focused on anxiety due to a difficult interpersonal interaction with his daughter," which is consistent with Mr. Yurow's own treatment records identifying symptoms of "anger, irritability, sadness, and occasional crying spells" in addition to general social alienation "[f]ollowing a difficult interpersonal interaction with his daughter." (D.I. 13 at 199) Contrary to Mr. Long's representation, the ALJ does not claim that Mr. Long's anxiety and depression would be "completely eradicated" if his conflict with his daughter were resolved. (D.I. 10 at 27)

Mr. Long's position that the ALJ improperly relied on outdated State agency opinions is

also misplaced.  First, the record reflects that Mr. Long was represented by counsel at his administrative hearing, but no request was made to obtain an updated State agency opinion or keep the administrative record open.  Courts within the Third Circuit have held that it is primarily the duty of counsel to develop the record in these circumstances.  *See Johnson v. Comm'r of Soc. Sec.*, 2021 WL 2661544, at *8 (E.D. Pa. June 29, 2021) (emphasizing that counsel has a duty to request an updated State agency opinion at the administrative hearing because the ALJ has "no enhanced duty to develop the administrative record" when the claimant is represented by counsel); *see also Turby v. Barnhart*, 54 F. App'x 118, 122-23 (3d Cir. 2002) (holding that the ALJ's duty to develop the record "is most acute where the claimant is unrepresented[.]").

Second, the record establishes that Mr. Yurow's most recent treatment notes post-dating the State agency opinions were generally consistent with both contemporaneous mental treatment records and treatment records that pre-dated the State agency opinions.  The ALJ found that the 2018 State agency opinions were supported by mental exam findings within normal limits during the time period between August 2017 and October 2019.  (D.I. 10 at 27)  For example, notes from an October 10, 2019 session with Dr. Hasan reveal normal mental status exam results in the areas of psychomotor activity, thought content, perceptual functioning, attitude, insight, judgment, attention/concentration, and impulse control.  (D.I. 13 at 166)  The "more recent" records from Mr. Yurow are dated between October 3 and December 3, 2019.  (D.I. 17 at 11; D.I. 13 at 199, 203-04, 207-08)  Those records include mental status exam results in which Mr. Long exhibited agitation and anxiousness, but his appearance, cognition, attention, memory, concentration, and insight were normal.  (*Id.*)  In notes from the October 16, 2019 visit, Mr. Yurow observed that "[t]he patient does appear to be benefiting from both psychotropic

medication and his use of coping skills," and Mr. Long reported that he could function very well and manage his symptoms with his increased coping skills. (D.I. 13 at 204) This evidence is neither remote in time nor divergent in content, and there is no indication that the record lacked sufficient evidence for the ALJ to make a well-informed decision regarding the severity of Mr. Long's mental impairments.

Finally, Mr. Long's argument that the ALJ failed to adequately articulate her reasons for rejecting Mr. Yurow's medical opinion is without merit. (D.I. 17 at 12) The ALJ found Mr. Yurow's opinion unpersuasive "because it is not supported by his treatment records, and is inconsistent with the prior administrative medical findings and evidence of stable mental exam findings." (D.I. 10 at 27) These reasons for rejecting Mr. Yurow's opinion are fully supported by the record. As Mr. Long explains in his briefing, Mr. Yurow opined that Mr. Long has "moderately severe limitations related to personal care habits, sustaining attendance in full time work, and coping with ordinary work pressures," as well as an inability to remain on task for 80% of the workday. (D.I. 17 at 12; D.I. 13 at 211-213) These opinions are inconsistent with Mr. Yurow's own treatment notes, which consistently confirm that Mr. Long is "[a]ppropriately dressed and groomed" and remains "[a]lert and oriented" in the areas of cognition, attention, memory, and concentration. (D.I. 13 at 199, 203-04) Mr. Yurow's treatment notes further identify Mr. Long's psychosocial strengths to include communication skills and problem-solving skills. (*Id.* at 200, 204) The record also confirms that Mr. Yurow's opinion is inconsistent with a series of mental status examinations in which Mr. Long exhibited normal findings. (D.I. 12 at 260-265, 276-278; D.I. 13 at 148, 151, 154, 156, 158, 160, 162, 164, 166)

The ALJ further noted the temporal gap in Mr. Yurow's treatment of Mr. Long and the narrow scope of his more recent treatment, which was limited to episodic bouts of anxiety

22

resulting from his difficult relationship with his daughter. (D.I. 10 at 27) These reasons for discounting the persuasiveness of Mr. Yurow's opinion are also supported by the administrative record, which confirms that Mr. Long had a four-year gap in treatment with Mr. Yurow from 2015 to 2019. (D.I. 13 at 199) ("Patient presents back for reevaluation he is known to me from 4 years ago, when we engaged in a course of therapy for his depressive symptoms."). The ALJ's description of the scope of Mr. Yurow's treatment appears to be derived directly from Mr. Yurow's own treatment notes, which explain that "[t]he symptoms of anxiety are mostly episodic, and occur with ruminations and obsessive thoughts about his predicament. At other times the patient reports that he functions very well. . . . At these times symptoms are generally minimal and manageable with his increased coping skills." (*Id.* at 204) Consequently, substantial evidence supports the ALJ's decision to discount Mr. Yurow's opinion.

### 3. Evaluation of Mr. Long's lumbar impairment

Mr. Long challenges the ALJ's determination that his lumbar impairment did not meet Listing 1.04, arguing that she ignored extensive evidence in the record and failed to clearly articulate her finding that the impairment did not meet or equal a listing. (D.I. 17 at 13-17) In response, the Commissioner contends that Mr. Long failed to satisfy his burden of showing that he met all the criteria of Listing 1.04. (D.I. 19 at 17)

The ALJ's decision that Mr. Long's lumbar impairment does not meet or equal a listing is supported by substantial evidence. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). To meet Listing 1.04A,[5] Mr. Long was required to prove that he had a disorder

---

[5] Mr. Long concedes that his condition does not satisfy Listing 1.04B or C. (D.I. 17 at 15 n.3)

of the spine with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]"  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04A; *see Doran v. Colvin*, 2014 WL 4660055, at *4 (M.D. Pa. Sept. 17, 2014) (emphasizing that all criteria of nerve root compression must be met to satisfy Listing 1.04A).  In this case, the ALJ concluded that Mr. Long's degenerative disc disease did not meet Listing 1.04A after a review of his September 2017 MRI results and office treatment records from Dr. Xing indicating that Mr. Long had a normal gait and did not require the use of an assistive device.  (D.I. 10 at 28)

There is no dispute that Mr. Long's MRI results showed evidence of nerve root compression.  (D.I. 19 at 18; D.I. 11 at 198-99, 205)  Nonetheless, Mr. Long's medical records support the ALJ's conclusion that his lumbar spine impairment did not satisfy all of the medical criteria of Listing 1.04A.  Specifically, the evidence considered by the ALJ shows that Mr. Long did not have positive straight-leg raising test results in both the sitting and supine positions.  A straight-leg raise test is positive if pain is produced between 30 and 70 degrees.  *See Jemison v. Saul*, 2020 WL 7258515, at *5 n.18 (E.D. Pa. Dec. 10, 2020); *see also Jenkins v. Comm'r of Soc. Sec.*, 192 F. App'x 113, 119 (3d Cir. 2006) (concluding that claimant failed to satisfy all the criteria listed in Listing 1.04 because she "could perform her straight leg raising test to 70 degrees.").  But Dr. Bose's treatment notes from Mr. Long's visit on November 3, 2017 indicate that Mr. Long's "[s]traight leg raising test is free to 70° bilaterally when there is hamstring tightness." (D.I. 11 at 205); *see Jenkins*, 192 F. App'x at 119.  Dr. Xing's treatment records from November 2017 to September 2019 also consistently revealed negative straight-leg raising

24

test results. (D.I. 12 at 227, 231, 234, 237, 243, 388, 392, 396, 400, 404; D.I. 13 at 98, 101, 105, 109, 113, 117, 120, 123, 127, 131) Notably, Mr. Long's reply brief does not direct the court to any portion of the administrative record showing that Mr. Long had the requisite positive straight-leg raising test results in accordance with the criteria of Listing 1.04A. (D.I. 20 at 5-6)

Relying on the Third Circuit's ruling in *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 119-20 (3d Cir. 2000), Mr. Long takes issue with the manner in which the ALJ assessed his lumbar impairment, arguing that the ALJ erred in mentioning or assessing Mr. Long's nerve root compression. (D.I. 17 at 16-17; D.I. 20 at 5) But the Third Circuit has since clarified that "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his [step three] analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). Here, the ALJ's discussion of Mr. Long's degenerative disc disease expressly acknowledges that Mr. Long's "straight leg raising test is free up to 70 degrees bilaterally when there is hamstring tightness." D.I. 10 at 30) This finding is sufficient to rule out satisfaction of the Listing 1.04A criteria. *See Doran*, 2014 WL 4660055, at *4 (emphasizing that all criteria of nerve root compression must be met to satisfy Listing 1.04A). Applying *Jones*, the ALJ's failure to use the phrase "nerve root compression" is not error because the ALJ sufficiently developed the record and explained her findings in this case. *Jones*, 364 F.3d at 505.

Mr. Long also argues that the ALJ did not adequately support her rejection of the medical opinion of Dr. Xing, a treating physician. (D.I. 17 at 17-19) According to Mr. Long, the ALJ improperly focused on his conservative treatment regimen, normal gait, and absence of a need for an assistive device, and she misconstrued his stable exam findings to suggest that he was not

impaired. (*Id.*)  In response, the Commissioner contends that the ALJ's assessment of Dr. Xing's opinion was adequately supported by evidence in the administrative record showing that Mr. Long received only conservative treatment for his pain, and his gait and strength were normal. (D.I. 19 at 19-20)

Substantial evidence supports the ALJ's decision finding Dr. Xing's opinion unpersuasive based on inconsistencies with the pain management records and other medical evidence of record.  (D.I. 10 at 32)  The administrative record indicates that Mr. Long initially rejected Dr. Bose's treatment recommendations of either nerve root block injections or fusion surgery, instead opting to control his symptoms with medication alone until ultimately pursuing injections in August 2018 and March 2019.  (D.I. 11 at 204, 241; D.I. 12 at 407; D.I. 13 at 95) The ALJ was entitled to consider Mr. Long's rejection of recommended courses of treatment in favor of more conservative measures in finding Dr. Xing's opinion unpersuasive.  *See, e.g.*, *Hutchins v. Astrue*, 2012 WL 995274, at *1 n.1 (W.D. Pa. Mar. 23, 2012) (finding the ALJ appropriately considered the claimant's pursuit of only conservative treatment while ignoring recommendations to undergo surgery); *Niglio v. Colvin*, 2013 WL 2896875, at *10 (W.D. Pa. June 13, 2013) (crediting ALJ's finding that claimant's "lack of follow-through with treatment recommendations [w]as evidence that her impairment was not as severe as alleged.").  Moreover, the ALJ appropriately considered evidence of Mr. Long's normal gait and full or good strength and found them to be inconsistent with Dr. Xing's opinion regarding Mr. Long's functional limitations and pain level.  (D.I. 10 at 32; D.I. 13 at 92); *see Bartmas v. Saul*, 2020 WL 1061473, at *5 (W.D. Pa. Mar. 5, 2020) (concluding that the ALJ properly found medical evidence to be inconsistent with complaints of disabling pain where the claimant "exhibited normal gait, full or good strength, minimal fatigue, fairly mild symptoms, and normal range of motion.").

The role of this court is not to reweigh the evidence, but to determine whether ALJ's findings are supported by substantial evidence. *Biestek*, 139 S. Ct. at 1154.  Because the ALJ's treatment of Dr. Xing's opinion and her analysis of the listing criteria were supported by explanation and were consistent with substantial evidence in the record as a whole, I recommend that the court deny Mr. Long's motion for summary judgment on this issue.

## V.    CONCLUSION

For the foregoing reasons, I recommend that the court DENY Mr. Long's motion for summary judgment (D.I. 16), and GRANT the Commissioner's cross-motion for summary judgment (D.I. 18).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The objection and responses to the objections are limited to ten (10) pages each.  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006*); Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated:  January 31, 2022

Sherry R. Fallon
United States Magistrate Judge

27